USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:____1/31/2025____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

LARRY RAMOS,

                              Defendant.

1:23-cr-24 (MKV)

**OPINION AND ORDER
DENYING
MOTION TO SUPPRESS**

MARY KAY VYSKOCIL, United States District Judge:

Defendant Larry Ramos is charged in a two-count Indictment with possession of firearms and ammunition following a prior felony conviction, in violation of 18 U.S.C. § 922(g)(1) ("Count One") and possession of a defaced firearm, in violation of 18 U.S.C. § 922(k) ("Count Two") [ECF No. 11 ("Indictment")].  Count One of the Indictment is based on Ramos's alleged possession of both "a defaced 9mm Ruger LC9 semiautomatic pistol" (the "pistol") and "a Winchester .22 caliber rifle" (the "rifle"), as well as "rounds of 9mm ammunition."  Indictment ¶ 1.  Count Two is based on the pistol.  Indictment ¶ 2.

Ramos moves to suppress the rifle and one round of nine-millimeter ammunition that were discovered during a search of an apartment where he lives with his mother [*see* ECF Nos. 33 ("Mot."), 72 ("Tr.") at 2:17–19, 77 ("Def. PHB"); GX7].  Although there is no dispute that Ramos' mother filled out and signed a "**CONSENT TO SEARCH**" form, Ramos contends that his mother did not voluntarily consent to the search of the apartment.  GX1 ("Consent Form"); *see* Tr. at 129:4–12.  The defense does not seek to suppress the pistol or the seven rounds of ammunition it contained when, the government alleges, Ramos dropped the loaded pistol out of his window, in full view of a police officer, before any search commenced.  *See* Cmpl. ¶¶ 4, 5; Tr. at 2:22–25.  As such, the parties agree, both Counts of the Indictment survive any resolution of the motion to

suppress. *See* Tr. at 212:6–11. The government opposes the motion [ECF Nos. 37 ("Opp."), 76 ("Gov. PHB")].

The Court held a hearing on Ramos' motion, at which both sides presented evidence. The Court also granted the request of the defense to submit post-hearing briefing [ECF Nos. 76, 77]. For the reasons set forth below, the motion to suppress is DENIED.

## I.    BACKGROUND

The defense filed a motion to suppress a rifle and one round of ammunition that officers of the New York Police Department ("NYPD") discovered in the defendant's apartment on the ground that such evidence was obtained without a warrant and without voluntary consent. Mot. ¶¶ 23, 24. The motion was accompanied by an unsigned document purporting to be the affidavit of the defendant's mother, Evelyn Ramos ("Mrs. Ramos"), and which expressly states that it is made only "upon information and belief" [ECF No. 33-1 ("Aff.")]. The Court later received, in advance of the hearing, a signed copy of the same affidavit. *See* Tr. at 2:22–23.

The gravamen of the motion is that NYPD officers forcibly entered the apartment, falsely "told [Mrs. Ramos] that they had a 'warrant,'" and "misrepresented" that the consent-to-search form was "an inventory of the items that they were taking." Mot. ¶¶ 10, 15, 19, 20, 28. Mrs. Ramos' affidavit expressly avers that the police "broke[] open" her door and "[o]ne of the officers told me that they had a 'warrant.'" Aff. ¶¶ 10, 12. Both the motion and the affidavit also stress that Mrs. Ramos "did not read" the Consent Form and imply that she could not read it because she was not wearing her glasses. Mot. ¶¶ 16, 17; Aff. ¶¶ 18, 19.

The Court held an evidentiary hearing on the motion. *See* Tr. The government called two witnesses, Detective Michael Prilook and Sergeant Brian Garay. The government also offered, and the Court accepted into evidence without objection from the defense, the consent form Mrs.

Ramos had filled out and signed, GX1 ("Consent Form"), and Prilook's contemporaneous notes from the evening of the search, GX10, among other exhibits, *see* GX 2, 3, 5–9. The defense called Mrs. Ramos, Defendant's niece Tiffany Mercado, and Detective Sarah LeClair. The parties each filed a post-hearing brief [ECF Nos. 76 ("Gov. PHB"), 77 ("Def. PHB")].

As developed below, the witnesses at the hearing offered three distinct accounts of the sequence of events on the evening of the search.[1] There appears to be no dispute that police officers entered Mrs. Ramos' apartment three separate times that evening, and the first entry was to arrest the defendant. With respect to the second entry, the witnesses for the government testified that, after the defendant was arrested and taken to the police precinct, officers returned to the apartment, Mrs. Ramos signed the Consent Form, and the police then searched the defendant's bedroom but did not discover any firearms evidence. Thereafter, the government witnesses testified, Detective Prilook received a call from Tiffany Mercado, who told him there was a rifle in a closet near the defendant's bedroom, and the police went to the apartment for the third time, at which point they discovered the rifle and one round of ammunition. Mrs. Ramos testified, however, that, during their second entry, the police officers searched her apartment without her consent and discovered the rifle and round of ammunition. Mrs. Ramos testified that, thereafter, she signed the Consent Form when the police came to her apartment for the third time. Mercado, another defense witness, testified that, contrary to Mrs. Ramos' testimony, during the second police entry, officers searched the defendant's bedroom without finding any evidence and Mrs. Ramos signed the Consent Form after that fruitless search. Mercado further testified that she witnessed the police return to the apartment for the third time, and, having already obtained Mrs.

---

[1] Leclair, a defense witness, principally testified that she did not "remember" the "order of the events" the evening of the search. Tr. at 182:23, 182:25. In particular, she did not remember whether Prilook and Garay started searching the apartment before or after Mrs. Ramos signed the Consent Form. *See* Tr. at 183:12–14.

Ramos' written consent to search the apartment, the police requested and received Mrs. Ramos' verbal consent to search the closet, at which point the police discovered the rifle and ammunition.

### A. The Entry for the Arrest

The testimony at the hearing establishes that at approximately "7:15 p.m." on July 5, 2023, three officers of the New York Police Department ("NYPD") went to the "last known address" of Larry Ramos, the defendant. Tr. at 15:2–3, 15:9. Detective Prilook was the lead detective for the arrest and was accompanied by Detective Leclair and another police officer, George Santiago, who did not testify at the hearing. Tr. at 12:24–13:1, 15:11–12. The arrest was pursuant to "an internal NYPD determination of probable cause," reflected in "a probable cause to arrest I-card" issued by the NYPD, rather than an arrest warrant. *See* Tr at 13:3–14:17.

Prilook and Leclair went up to the apartment ("1C" on "the second floor"), while Santiago stayed outside and "maintained visual" on the defendant's "front window." Tr. at 15:22–16:3. Prilook testified that he knocked, rang the bell, and heard movement inside the apartment, and then he received a radio communication from Santiago that Ramos "was exiting the front window and that a firearm dropped to the ground." Tr. at 17:2–11. At that point, Prilook testified, the officers knocked "harder" and "kick[ed] . . . on the door." Tr. at 17:15, 17:22.

Prilook testified that "the door was opened by" Mrs. Ramos. Tr. at 17:15. He testified that the officers' actions damaged the apartment door, but they did not knock the door down or break the lock. *See* Tr. 17:17–18:3. Mrs. Ramos testified differently about the officers' entry for the arrest. She testified that she "heard knocking" and "was going towards the door" when she heard "like a bang, and [her] door lock came apart and then [she saw] the cops." Tr. at 119:9–13. On this point, Sergent Garay, who was not present for the arrest, testified that he later observed "some damage to the door" of the apartment, but it was not "major damage." Tr. at 82:6, 82:12. Tiffany

Mercado, who likewise was not present for the arrest, testified that the damage she observed to the apartment door was that the lock was "jammed." Tr. at 166:14.

Prilook testified that, after Mrs. Ramos opened the door, he arrested the defendant. *See* Tr. at 18:6–22. He testified that he showed the "probable cause to arrest I-card" to Ramos and his mother. Tr. at 19:3–10. He further testified that he never claimed to have an arrest warrant or a search warrant. Tr. at 20:17–22.

Mrs. Ramos testified that she asked the police if they had a warrant, and one of the officers "flashed" a piece of paper at her. Tr. at 133:5–11. Mrs. Ramos testified, however, that the police "didn't" claim that piece of paper was a warrant, and she knew it was not a warrant. Tr. at 133:12–14, 134:7–12; *see* Tr. 119:19–23. Specifically, Mrs. Ramos was asked, "So at the time that they arrested your son, you didn't think they had a warrant to arrest him?," and she answered, "No." Tr. at 134:7–9. Mrs. Ramos was then asked, "You didn't think they had a warrant to search your house either, right?" Tr. at 134:10–11. She again answered, "No." Tr. at 134:12.

After the police arrested the defendant, "they all left" the apartment. Tr. at 120:14, 120:19; *see* Tr. at 21:16–24. Prilook took the defendant to the precinct and "notified" his sergeant, Garay, "of the situation," including that a "gun . . . was on the ground" in front of the apartment building, and "Evidence collection was responding." Tr. at 22:6–7, 19.

**B. The Second Police Entry**

Prilook testified that he, Leclair, and, this time, Garay went back to the apartment building at approximately 8:00 p.m. Tr. at 22:8–13, 22:22–23. Mrs. Ramos similarly testified that the police returned "[m]aybe half an hour" after they had left. Tr. at 121:2. With respect to this entry, the witnesses all agree that Mrs. Ramos opened the door for the police. *See* Tr. at 121:5–8, 136:13–17; Tr. at 23:6–7; Tr. at 81:25–82:3. Indeed, Mrs. Ramos testified that, when the police returned

to the apartment, "[t]hey knocked at the door," and she "opened the door." Tr. at 121:5–8; see id. at 136:13–17 ("Q: Did you let them in? A: Well, I opened the door.").

According to Prilook and Garay, during this visit to the apartment, they spoke with Mrs. Ramos to request her consent for a search, Mrs. Ramos signed the Consent Form, and the officers searched only the defendant's bedroom without recovering any evidence. Specifically, Prilook and Garay both testified that they had a conversation with Mrs. Ramos "in regards to getting her consent to search" her apartment. Tr. at 81:4–11; see Tr. at 22:22–23:2, 23:24–24:2. They both testified that they "explained" their "concern" that, since the defendant had dropped one firearm out the window, "there may be more" in the apartment. Tr. at 24:5–8; see Tr. at 81:4–11. They both testified that Mrs. Ramos was "fully cooperative with" the officers and "very concerned that there would be possibly other firearms in the house." Tr. at 82:23–25; see Tr. at 86:23–87:5; see Tr. at 24:10–13 (Prilook testifying that Mrs. Ramos was "[v]ery cooperative and understanding" and "did not want [firearms] in her apartment").

Prilook and Garay both testified that they gave Mrs. Ramos "a written NYPD consent to search form." Tr. at 24:16–18; see Tr. at 86:1–2. Garay testified: "She read it and we read it to her, and we made sure she fully understood what we were asking of her, what the form stated." Tr. at 86:2–4. Prilook similarly testified that he discussed the Consent Form with Mrs. Ramos, she "appear[ed] to understand" what he said, and "she appear[ed] to actually read" the Consent Form. Tr. at 25:2–3, 25:22–26:21, 28:11–14. Leclair, a defense witness, also testified that she was "present for when the consent to search form was filled out, and that it was explained to Ms. Ramos what the form was, [and] what was going to happen." Tr. at 178:17–19.

Prilook and Garay both testified that they never told Mrs. Ramos they had a warrant, that she was required to sign the Consent Form, or that the form was "an inventory." Tr. at 20:17–22,

28:18–19, 28:21–22, 86:15–18, 86:10–14.  Prilook and Garay further testified that Mrs. Ramos did not "appear to be frightened," nor did she "express any concern about consenting to the search of her apartment."  Tr. at 29:9–10, 29:17–19; *see* Tr. at 86:3, 86:5–7.  On the contrary, according to Prilook and Garay, Mrs. Ramos was "very, very cooperative with [the police] and understanding of the situation," she "offer[ed]" the officers "water" because it was "very warm that day," and she did not want any firearms in the apartment.  Tr. at 29:12–15; *see id.* at 24:10–13, 86:23–87:5.  Prilook and Garay also testified that no officer ever handcuffed Mrs. Ramos, drew a weapon in her presence, or threatened her in any way.  Tr. at 29:2–7, 86:19–20, 87:6–7.

Prilook and Garay both testified that Mrs. Ramos filled out and signed the Consent Form.  *See* Tr. at 25:22–26:21, 84:8–85:2.  Prilook and Garay testified that, after Mrs. Ramos signed the Consent Form, they conducted a search.  *See* Tr. at 29:23–25, 30:24, 87:11–23.  Both Prilook and Garay denied searching the apartment before Mrs. Ramos signed the Consent Form.  Tr. at 29:20–22, 87:8–10.  Both Prilook and Garay specifically testified that, immediately after Mrs. Ramos signed the Consent Form, their search "focused" only on the defendant's bedroom.  Tr. at 30:5, 87:14–16.  According to both Prilook and Garay, they did not find any firearms or ammunition at that time.  Tr. at 30:8–10, 87:22–23.  Further, according to both Prilook and Garay, having failed to find any firearms evidence in the defendant's bedroom, the officers left the apartment.  Tr. at 30:11–12, 87:24–88:1.

Mrs. Ramos, by contrast, testified that the police searched her apartment and discovered the rifle and ammunition before she signed the Consent Form.  Specifically, Mrs. Ramos testified that when police officers arrived at her apartment for the second time, they "asked" to "go in [her] son's room," but she "said no."  Tr. at 121:10–14.  According to her testimony, at that point, the officers had not yet asked her to sign the Consent Form.  *See* Tr. at 122:24–123:1.  Mrs. Ramos

7

testified that the officers "just started looking around," searched the defendant's bedroom and a nearby closet, and "came out with . . . a rifle," among other things.  Tr. at 121:16, 122:1517; *see id.* at 121:16–20, 122:8–10.

Mrs. Ramos testified that she signed the Consent Form only "after" the officers found and "show[ed] [her] the guns" and then "left and came back" again, for the third time, "with a forensic." Tr. at 123:12–13, 125:15; *see* Tr. at 124:9–24 (testifying that she signed the Consent Form "the third time officers came in"), 129:4–15.

Mrs. Ramos agreed, however, that she did fill out and sign the Consent Form.  Initially, she testified that the police had "just showed [her] where to sign," and she "just signed."  Tr. at 125:4.  However, when pressed, Mrs. Ramos acknowledged that she had filled out multiple fields of the Consent Form, including her name, her date of birth, and her address, which she wrote again in the field for the address of the search, and the date.  *See* Tr. at 129:4–12, 145:5–6.  Specifically, Mrs. Ramos testified that all of the "handwriting at the top of the document" is her handwriting and looks how her handwriting "normally . . . looks."  Tr. at 129:3–10; *see id.* at 129:10 ("The address is, yes, that's me."), 129:12 ("That's definitely my signature."), 129:15 ("everything else is mine[.]"); *id.* at 144:12–15, 145:4–7.

The Consent Form, which is in evidence, bears the heading, in bold text, "**CONSENT TO SEARCH**."  GX1.  It is a brief document.  The top portion provides that the person identified in the fields for name, date of birth, and address "voluntarily consent[s] to a complete search of" the location identified in the field for the address of the search.  GX1.  It advises the signatory of both the "right to refuse consent before any search is conducted," and "the right to revoke such consent, in whole or in part, at anytime[sic]."  GX1.

Prilook and Mrs. Ramos both gave testimony about the time on the Consent Form, which reads 8:05, although the number eight looks irregular. [2] Mrs. Ramos testified that the number eight does not look how she normally writes it, "but the zero and the five" are in her ordinary handwriting. Tr. at 144:23, 145:1, 145:4. Prilook testified that Mrs. Ramos wrote in the time as 8:05 p.m., but, based on his notes, "the more accurate approximate time" that he believes she signed the Consent Form was 8:30 p.m. Tr. at 26:19–27:3; *see* Tr. at 37:23–38:5; GX10. Specifically, Prilook's contemporaneous notes, which were admitted into evidence without any objection from the defense, state, "2030," meaning 8:30 p.m., "mom consent to search." Tr. at 37:24–25; GX10.

On cross-examination, defense counsel asked Prilook if it was "fair to say" that the eight in the "8:05" time on the Consent Form "looks like a nine that has been changed into an eight." Tr. at 71:16–18. He responded, "No." Tr. at 71:19. Prilook and Garay both testified that nobody made "any alterations" to the time, as Mrs. Ramos wrote it, on the Consent Form. Tr. at 27:6; *see id.* at 74:8–13, 84:20–85:2.

Mrs. Ramos testified that nobody else was with her in the apartment when the officers conducted the search, which Mrs. Ramos testified was during their second visit to the apartment. Tr. at 126:16–18. She testified that at "about 7:15 or 7:30,"[3] she "called [her] granddaughter," Tiffany Mercado. Tr. at 126:18–21. However, Mrs. Ramos testified, Mercado "came in . . . after everything was already over." Tr. at 127:1–2.

---

[2]  GX1.

[3] Based on the government's evidence, this is the approximate time of the arrest of the defendant. *See* Tr. at 15:9 (Prilook testifying that he, Leclair, and Santiago arrived at the apartment building at approximately "1915 hours, which is 7:15 p.m."); GX10.

Tiffany Mercado, the defendant's niece and a witness for the defense, gave testimony that contradicts Mrs. Ramos' account in several respects. As developed below, Mercado testified to her understanding that, during the second police visit, officers searched the defendant's bedroom, but did not find anything, and Mrs. Ramos signed the Consent Form after that fruitless search. *See* Tr. at 155:11–21. Mercado also testified that she was present when, during the third visit, officers conducted a second search of the apartment, with Mrs. Ramos' verbal consent, and the officers found the rifle and ammunition. *See* Tr. at 156:8–20. Mrs. Ramos was asked by defense counsel whether she ever gave the police verbal consent to search. Tr. at 128:2. Mrs. Ramos responded, "I can't recall, honestly." Tr. at 128:3.

### C. The Third Police Entry

As noted above, Mrs. Ramos testified that police officers came back to her apartment a third time the evening of the arrest, and that is when she signed the Consent Form. *See* Tr. at 123:12–16, 124:22–24. Specifically, Mrs. Ramos testified that, having found "the guns" during their second visit, the police left the apartment and "took the guns with them," but then "they came back up with the guns." Tr. at 143:1–5. She testified that she "really didn't" understand why they came back, but "they said something about the forensic." Tr. at 143:12–20.

Mrs. Ramos testified that, during the third police entry, the officers "came to [her] and they brought a paper." Tr. at 123:6, 123:12–13. She testified that she did not read the Consent Form because she "didn't have [her] glasses." Tr. at 125:2–3. She testified: "I didn't know what it was for," and the police "didn't really explain to [it] me . . . , but I went and I signed it. I thought [I] had to." Tr. at 123:7–10. However, Mrs. Ramos repeatedly, and to the visible frustration of the defendant, testified that she was never under the impression that the police had a warrant to search her apartment. *See* Tr. at 134:10–12; *see id.* at 125:15–16, 125:20–25, 126:1–3, 134:3–12, 137:7–

10

13, 146:18–13.  When asked by defense counsel "what [she] thought [she was] signing," Mrs.

Ramos testified: "I just thought honestly that I was signing them taking my son and about that they

were there."  Tr. at 125:7–8.  Prompted by defense counsel, Tr. at 125:9 ("what about the guns?"),

she added: "Also because of the guns, mostly because of the guns," Tr. at 125:10.

Prilook and Garay gave a different account of their third entry into the apartment.  Prilook

testified that, after failing to find firearms evidence in the defendant's bedroom, he went down "to

the front of the building where the firearm was discarded" but did not leave because "[t]he scene

was still being secured for evidence." Tr. at 30:17–18, 31:4–5.  Prilook testified that, while he was

in front of the building, he "received a phone call from" Tiffany Mercado, who Prilook described

as Mrs. Ramos' daughter and the defendant's sister.  Tr. at 31:13–20.  He testified that, while still

in the apartment, he had given a "business card" to Mrs. Ramos, "which had [his] name and contact

number." Tr. at 31:16–17; *see* DXF.  Prilook testified that Mercado called him and told him "there

was a rifle in the closet" near the defendant's bedroom.  Tr. at 31:20.  He did not know "what

phone number" she used to call him.  Tr. at 32:8–10.

Garay's testimony about the reason for the third entry and second search of the apartment

was similar.  He testified that they "were about to go" back to the precinct when "Prilook received

a phone call." Tr. at 88:12, 88:18.  Garay testified that the call "was either from [the defendant's]

sister or his mother" and was about "a rifle that was inside one of the closets."  Tr. at 88:19–21.

Garay testified that he did not participate in or witness the call, but Prilook "notified" him of the

conversation.  Tr. at 89:2, 89:4–9.

Prilook and Garay both testified that, after Prilook received the call, they "went directly

upstairs to the apartment" and were shown "to the closet where there was a rifle." Tr. at 32:15,

32:17–20; *see id.* at 89:12–14.  According to both Prilook and Garay, Tiffany Mercado was present

when they searched the closet and discovered the evidence. *See* Tr. at 32:18–24, 89:13. Prilook's contemporaneous notes reflect that the rifle was recovered at "2120 hours," meaning 9:20 p.m. Tr. at 39:16; GX10. The officers also found "a nine-millimeter round of ammunition" in a separate section of the closet. Tr. at 33:11.

The defense disputes that Mercado called Prilook. In particular, Mercado testified that she did not call Prilook the night of the search. Tr. at 157:9–13. She testified that she used "the T-Mobile app" to "find [her] phone records" for that night. Tr. at 157:19-20. The defense offered, without any objection from the government, a "PDF" that Mercado had created using the app, purporting to reflect her phone records. *See* DXE, DXH. Mercado testified that those records did not list any outgoing calls to Prilook's phone number. *See* Tr. at 159–162; DXF.

On cross-examination, defense counsel challenged Prilook on his claim that Mercado had called him. *See* Tr. at 61:11–62:6. In particular, defense counsel asked if Prilook "had a record" of the phone call. Tr. at 61:20. Prilook responded that he "tried to obtain the record" but "it did not go back that far." Tr. at 61:22–24.

The defense also cross-examined Prilook and Garay on when, during the course of the case, they first stated that Prilook had received a phone call from Mercado that prompted a third visit to the apartment and second search for firearms evidence. Relying on notes of conversations between the officers and the prosecution, which are not in evidence, defense counsel elicited that, in April 2024, the prosecutor noted for the first time Garay's statement that Prilook had received a phone call about the rifle that prompted the second search. *See* Tr. at 112:19–24. Defense counsel asked Garay what "compelled [him] to tell the prosecution about this call that supposedly happened?" Tr. at 113:19–20. Garay testified that he told the prosecutor about the call because "[t]hat's what happened." Tr. at 113:2. Defense counsel asked Prilook to confirm that he had never mentioned

the call from Mercado until after Garay did and the prosecutor asked Prilook about it. *See* Tr. at 48:24–60:4. Prilook responded that he did not recall the substance of his conversations with the AUSA. *See* Tr. at 51:18–22, 54:23, 55:9–10 ("I don't recall either way if it was said [in earlier conversations] or not. Apparently it's not documented."), 56:10, 56:22, 57:19.

As mentioned above, Mercado testified that she was present during the third police entry and second search of the apartment. Specifically, she testified that, the night of the search, Mrs. Ramos called her "hysterical around 7:30-ish" and told her the defendant had been arrested. Tr. at 151:12. Mercado testified that she "got there within ten minutes" and "double-parked [her] car." Tr. at 151:23, 151:25. She testified that she briefly went up to the apartment but left to ask the police, who at that point were in front of the building, what was happening. *See* Tr. at 152:1–22. Thereafter, she testified, she wasn't allowed back in for a period of time. Tr. at 153:9–10. As such, according to her testimony, Mercado went to move her car and, after she returned, she was allowed to enter the apartment. *See* Tr. at 155:8–9.

At this point, Mercado testified, Mrs. Ramos said that the police had "already search[ed]" the defendant's bedroom and, "afterwards, . . . there was a paper that they wanted her to sign." Tr. at 155:16–19; *see id.* 155:14–15, 168:8 ("she . . . signed it"). According to Mercado, Mrs. Ramos told Mercado that "she wasn't able to really read [the paper] because, one, she didn't have her glasses, and, two, her nerves . . . ." Tr. at 155:17–21.

Mercado further testified that, while she was present, "the officers came" and "asked if it was okay for them to look in [the defendant's] room again." Tr. at 155:11–15. Mercado testified that Mrs. Ramos responded, "well, go ahead, you already . . . searched the first time, might as well go ahead." Tr. at 155:22–24. She further testified that, after going into the defendant's bedroom, the officers "asked if they could just look inside of [the nearby closet]." Tr. at 156:8. Mercado

testified that Mrs. Ramos "again . . . said go ahead because . . . it's her closet. And that was that, they did their search." Tr. at 156:9–10. According to Mercado's testimony, that is when the officers "came out with" the rifle and ammunition. Tr. at 156:20, 157:4.

## II. <u>LEGAL STANDARDS</u>

"It is well settled that a warrantless search does not violate the Fourth Amendment if 'the authorities have obtained the voluntary consent of a person authorized to grant such consent.'" *United States v. Hernandez*, 85 F.3d 1023, 1028 (2d Cir. 1996) (quoting *United States v. Elliott*, 50 F.3d 180, 185 (2d Cir. 1995)). The key question is "whether the officer had a reasonable basis for believing that there had been consent to the search." *United States v. O'Brien*, 926 F.3d 57, 77 (2d Cir. 2019) (quoting *United States v. Garcia*, 56 F.3d 418, 423 (2d Cir. 1995)). "The government has the burden of proving, by a preponderance of the evidence, that a consent to search was voluntary." *United States v. Isiofia*, 370 F.3d 226, 232 (2d Cir. 2004).

The question of whether consent to a search was voluntary "is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). A person's consent was not voluntary if his or her "will was overborne" by authorities. *Id.* at 226. As such, police cannot use force or threats to obtain voluntary consent. *See id.* at 228. However, "a display of force does not automatically preclude a finding of voluntariness." *United States v. Snype*, 441 F.3d 119, 131 (2d Cir. 2006).

Voluntariness is assessed by an "objective" standard. *Isiofia*, 370 F.3d at 231. In assessing voluntariness, courts consider, among other factors: (1) the consenting person's "age, education, [and] intelligence," *United States v. Puglisi*, 790 F.2d 240, 243 (2d Cir. 1986); (2) the "length of detention," *id.*; (3) the "use of physical punishments or deprivations," *id.*; (4) "whether the alleged consenting person was advised of his constitutional rights," *id.*; (5) whether the person was "in

custody and in handcuffs," *United States v. Echevarria*, 692 F. Supp. 2d 322, 336–37 (S.D.N.Y. 2010); *accord United States v. Lavan*, 10 F. Supp. 2d 377, 384 (S.D.N.Y. 1998); *United States v. Brown*, No. 22-cr-266 (PGG), 2023 WL 208171, at *10 (S.D.N.Y. Jan. 13, 2023); (6) whether there was an "overwhelming show of force" or "brandishing of weapons," *Phillips v. County of Orange*, 894 F. Supp. 2d 345, 371 (S.D.N.Y. 2012) (quoting *United States v. Drayton*, 536 U.S. 194, 204 (2002)); (7) whether the police said "a search warrant would be obtained," *Echevarria*, 692 F. Supp. 2d at 336; *accord Lavan*, 10 F. Supp. 2d at 384; *Brown*, 2023 WL 208171, at *10; and (8) whether the consenting person had "previously had refused to consent," *Echevarria*, 692 F. Supp. 2d at 336–337; *accord Lavan*, 10 F. Supp. 2d at 384; *Brown*, 2023 WL 208171, at *10. This list is not exhaustive, and none of these factors is determinative. *See United States v. Crespo*, 834 F.2d 267, 270 (2d Cir. 1987).

### III.    DISCUSSION

The dispositive facts that require denial of the defendant's motion to suppress are that Mrs. Ramos gave the NYPD written and verbal consent to search her apartment, and there is no evidence of coercion by the police that would render her consent involuntary. *See United States v. Schaefer*, 519 F. App'x 71, 72 (2d Cir. 2013). There is no dispute that Mrs. Ramos signed a Consent Form. *See* GX1; Tr. at 123:9 (Mrs. Ramos: "I signed it."). It states that she "voluntarily consent[ed] to a complete search" of her apartment. GX1. The Consent Form that Mrs. Ramos indisputably signed also advised her of her rights to "refuse" and to "revoke" her consent, in whole or in part, at any time. GX1. Further, at the hearing, the defendant's own witness, Tiffany Mercado, testified that the police "asked" for and received Mrs. Ramos' verbal consent to search the closet where they

found the rifle and ammunition the defense seeks to suppress.  Tr. at 156:8–10.

The government has offered evidence to carry its burden that Mrs. Ramos' written consent was voluntary, rather than a product of coercion.  *See Isiofia*, 370 F.3d at 232.  All three police witnesses, including Leclair, who was called by the defense, testified that the police explained the Consent Form to Mrs. Ramos, and she appeared to understand it.  *See* Tr. at 25:2–3, 25:22–26:21, 28:11–14, 86:2–4, 178:17–19.  Based on the Court's own observations of the witness, nothing about Mrs. Ramos' "age, education, [or] intelligence" precluded her voluntary consent.  *Puglisi*, 790 F.2d at 243.  She was never detained or subject to "physical punishments or deprivations."  *Id.* As noted above, the Consent Form itself advised Mrs. Ramos of her rights to refuse and to revoke her consent to search.  *See id.*  Prilook and Garay also testified that the police never drew their weapons, handcuffed Mrs. Ramos, or threatened her in any way.  *See* Tr. at 29:2–9, 86:19–20, 87:6–7; *Phillips*, 894 F. Supp. 2d at 371; *Echevarria*, 692 F. Supp. at 336.

Prilook and Garay further testified that Mrs. Ramos never appeared frightened or expressed any concerns about consenting to the search of her apartment.  *See* Tr. at 29:9–10, 29:17–19, 86:3, 86:5–7.  Voluntariness is "objective," *Isiofia*, 370 F.3d at 231, and the key question is whether the officers had reason to believe Mrs. Ramos gave her consent.  *See O'Brien*, 926 F.3d at 77.  As such, the testimony of Mrs. Ramos and her granddaughter, Mercado, that Mrs. Ramos' "nerves were bad" during her encounter with the police, Tr. at 122:6, 155:21, carries little weight. Although the "overall encounter" may have been "stressful, the record [simply] lacks any evidence that [Ramos'] mother was coerced."  *United States v. Lopez*, No. 22-2872, 2024 WL 4182291, at *2 (2d Cir. Sept. 13, 2024).

The gravamen of the defense motion to suppress, as originally submitted, was that the police falsely "told [Mrs. Ramos] that they had a 'warrant.'"  Mot. ¶ 10.  In her Affidavit, Mrs.

Ramos expressly avers: "One of the officers told me that they had a 'warrant,'" although she includes the striking caveat that her Affidavit is only "upon information and belief." Aff. ¶¶ 3, 10. To be sure, "consent" is not voluntarily when it "has been given only after the official conducting the search has asserted that he possesses a warrant." *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968). However, at the hearing, Mrs. Ramos repeatedly testified that she was never under the impression that the police had a warrant to search her apartment. *See* Tr. at 134:10–12; *see id.* at 125:15–16, 125:20–25, 126:1–3, 134:3–12, 137:7–13, 146:18–13. She expressly testified that the police did not tell her they had a warrant. Tr. at 133:12–14. The glaring conflict between Mrs. Ramos' Affidavit and her testimony at hearing on this point alone raises serious doubts about her credibility as a witness.

The defendant's motion further asserts that the police "misrepresented the nature of the" Consent Form. Mot. ¶ 28. However, there is absolutely no evidence in the record that the police gave Mrs. Ramos false information about the nature of the Consent Form. The defense contends, without support, that the police falsely claimed that the Consent Form was an inventory. *See* Mot. ¶¶ 19, 28. However, even Mrs. Ramos' discredited, "information and belief" Affidavit states only that "[i]t was [her] understanding that [the Consent Form] was an inventory of the items they were taking." *Compare* Mot. ¶ 28, *with* Aff. ¶ 21. At the hearing, Mrs. Ramos did not testify that the police falsely told her the Consent Form was an inventory. Rather, she initially testified that she thought she was signing a document related to the defendant's arrest "and about that [the police] were there." Tr. at 125:7–8. Once prompted by defense counsel, Mrs. Ramos changed her account, testifying, in response to a leading question, that she thought the Consent Form was "mostly because of the guns." Tr. at 125:9–10. Even in her revised account, however, Mrs. Ramos did not

suggest that a police officer had told her the Consent Form was an inventory, or that it was anything other than a consent-to-search form. *See id.*

The Court also notes that Mercado testified about a conversation in which Mrs. Ramos said the police had "search[ed]" the defendant's bedroom *and* "there was a paper that they wanted her to sign." Tr. at 155:16–19; *see id.* 155:14–15, 168:8. This testimony, by a defense witness, that Mrs. Ramos had spontaneously linked the search of the bedroom with the document that she signed in her conversation with Mercado suggests that Mrs. Ramos understood the Consent Form related to the search.[4] Furthermore, according to Mercado, the police had not yet found the firearms evidence when Mrs. Ramos spoke to Mercado about having signed the Consent Form. *See* Tr. at 155–156; *see also id.* at 168. If the Court credits Mercado, the defendant's witness, her testimony vitiates the defense contention that Mrs. Ramos believed the Consent Form was an inventory of firearms evidence that the police had already found.

The defense next contends that Mrs. Ramos did not provide voluntary consent because, she testified, she was not wearing her glasses and did not read the consent form. The Court rejects that argument. *See United States v. Schaefer*, 859 F. Supp. 2d 397, 411 (E.D.N.Y. 2012) (Bianco, J.), *aff'd*, 519 F. App'x 71 (2d Cir. 2013). The Consent Form bears the heading "**CONSENT TO SEARCH**," in bold, capital letters and a large typeface. GX1. As such, a "cursory glance" at the document "would have revealed what it was." *United States v. Ofsink*, 2021 WL 457230, at *11 (E.D.N.Y. Feb. 8, 2021).

Moreover, the defense contention that Mrs. Ramos could not see the form simply is not credible on the record before the Court. Mrs. Ramos properly and legibly filled out multiple fields of the form. *See* GX1. She expressly testified that she wrote in her own name, her date of birth,

---

[4] "At a suppression hearing, the court may rely on hearsay." *United States v. Raddatz*, 447 U.S. 667, 679 (1980).

her address, which she wrote a second time in the field for the address of the search, the date, and at least part of the time. Tr. at 129:4–12; 145:1–6. Her writing is legible, properly affixed on the lines on the form, and substantively responsive to the prompts for each field. Mrs. Ramos further testified that her handwriting on the form looks how her handwriting "normally . . . looks." Tr. at 129:9–10. It is not credible that Mrs. Ramos could see well enough to properly fill out the form, in her normal handwriting, but could not see well enough to read the "**CONSENT TO SEARCH**" heading and the text stating that she "voluntarily consent[ed] to a complete search of" her apartment and had the rights to "refuse" and to "revoke" such consent. GX1; *see Schaefer*, 859 F. Supp. 2d at 411 (rejecting, as not credible, the defendant's testimony that he "did not read the written consent-to-search form before signing it because he did not have his glasses").

To the extent that the defense contends that Mrs. Ramos simply did not read and understand the form, even though she could have done so, the Court similarly rejects that contention. As the Court has already indicated, the Consent Form is clearly labeled, brief, and free of legal jargon. *See* GX1. According to her own testimony, Mrs. Ramos filled out identifying information, at "the top of the document," directly before and after the words "voluntarily consent to search." Tr. at 129:3–10; GX1. Moreover, other courts in this Circuit have rejected unsupported assertions that a signatory simply "failed to read" a consent form. *United States v. Gazzara*, 587 F. Supp. 311, 328 (S.D.N.Y. 1984) ("contention that she failed to read or understand the import of this brief form before signing it was not believable"); *see Schaefer*, 859 F. Supp. 2d at 411; *Ofsink*, 2021 WL 457230, at *11; *see also United States v. Graham*, 2023 WL 11952997, at *11 (W.D.N.Y. Feb. 18, 2023). Accordingly, the Court finds that Mrs. Ramos read and understood the import of the Consent Form that she signed.

The defense further contends that Mrs. Ramos signed the Consent Form because she was

"frightened" by a supposed forcible entry by the police. Mot. ¶ 18; Aff. ¶ 20. The defense claims that police officers broke open the door when they first arrived to arrest the defendant. *See* Aff. ¶ 10; Tr. at 119:9–13. As an initial matter, the weight of the evidence is that the officers damaged Mrs. Ramos' door but did not break it down. *See* Tr. at 166:14 (Mercado testifying that the lock was "jammed"); Tr. 17:15–18:3 (Prilook testifying that he did not break down the door, and Mrs. Ramos opened the door); Tr. at 82:6, 82:12 (Garay testifying that there was no "major" damage). Further, even if officers broke open the door when they arrested the defendant, such a display of force would not preclude finding that Mrs. Ramos later voluntarily consented to a search of her apartment. *See Snype*, 441 F.3d at 131. Indeed, the Second Circuit has held that officers who "kick[ed] the door" of an apartment and entered it without voluntary consent later obtained voluntary consent to search the apartment. *See Crespo*, 834 F.2d at 269.

Here, by all accounts, there was an interval of at least thirty minutes between the time the police arrested the defendant and the first time they returned to the apartment. *See* Tr. at 22:8–13, 22:22–23, 121:2. In addition, all of the testimony establishes that, after the initial entry for the arrest, Mrs. Ramos opened the door for the police. *See* Tr. at 121:5–8, 136:13–17; Tr. at 23:6–7; Tr. at 81:25–82:3. Mrs. Ramos therefore had time to "calm[] down" before the officers requested her consent to search. *States v. Calix*, No. 13 Cr. 582 (RPP), 2014 WL 2084098, at *5 (S.D.N.Y. May 13, 2014). Moreover, the Second Circuit has found voluntary consent following much more significant displays of force. *See United States v. Ansaldi*, 372 F.3d 118, 129 (2d Cir. 2004) (use of guns to effectuate arrest and handcuffing of defendant did not render his consent to search his home involuntary).

The defense seems to contend that Mrs. Ramos did not provide voluntary consent because police officers searched her apartment before she signed the Consent Form. *See* Def. PHB at 4.

Mrs. Ramos is the only witness who testified that she did not sign the Consent Form until after the police found the rifle and round of ammunition the defense seeks to suppress. *See* Tr. at 123:12–13, 125:15. Her account directly contradicts the testimony of several other witnesses, including the defense witness Tiffany Mercado, as well as the police witnesses. Moreover, as explained below, there is reason to doubt Mrs. Ramos' account standing on its own.

The Court finds, based on the great weight of evidence and its own observations of the demeanor of the witnesses, that Mrs. Ramos signed the Consent Form before the officers found the rifle and ammunition. As an initial matter, both Prilook and Garay testified that the police did not begin any search until after Mrs. Ramos had signed the Consent Form. *See* Tr. at 29:20–22, 87:11–23. Although Leclair testified that she could not remember if the search *began* before Mrs. Ramos signed the Consent Form, she did not suggest the officers found any evidence before Mrs. Ramos signed the form. *See* Tr. at 183:12–14.

Crucially, Mercado, the defendant's own witness, testified that Mrs. Ramos had already signed the Consent Form before Mercado arrived back at the apartment and personally witnessed the officers search the closet and discover the rifle and one round of ammunition. *See* Tr. 155–156. Mrs. Ramos' testimony was that, after the defendant's arrest, police entered her apartment for the second time, nobody else in her family was in the apartment, and the officers conducted a single search that produced the firearms evidence in issue. Tr. at 126:16–18, 127:1–2 (Mrs. Ramos testifying that Mercado did not arrive until "after everything was already over"). That testimony directly contradicts the testimony of Mercado, Prilook, and Garay, who all testified that the police found the rifle and ammunition while Mercado was present during the officers' third entry and second search of the apartment. *See* Tr. at 32:18–24, 89:13, 155–156.

Put another way, Mrs. Ramos testified that she did not sign the Consent Form until the

third time the officers came to her apartment. *See* Tr. at 124:9–24. However, there is no way to reconcile that timing with Mercado's testimony that Mrs. Ramos had already signed the Consent Form before Mercado returned to the apartment. *See* Tr. at 155:18–19, 168:8. Both Mrs. Ramos and Mercado testified that Mercado was not present when Mrs. Ramos signed the Consent Form. *See* Tr. at 126:16–18, 127:1–2, 155:16–19. However, Mercado, Prilook, and Garay all testified that Mercado was present during the officers' third visit to the apartment. *See* Tr. at 32:18–24; 89:13, 155–156. As such, multiple witnesses contradicted Mrs. Ramos' contention that she signed the Consent Form, without Mercado present, during the third visit.

Moreover, the documentary evidence supports finding that Mrs. Ramos gave her written consent for a search before the officers found the rifle and ammunition. In particular, Prilook's contemporaneous notes reflect that the police obtained "mom['s] consent" at approximately 8:30 p.m. and recovered the rifle at "2120 hours," meaning 9:20 p.m. GX10. The time on the Consent Form is 8:05 p.m. GX1. The defense speculates that the officers improperly changed the time from a "nine . . . into an eight." Tr. at 71:16–18. However, the number written on the form looks like more a seven that was changed to an eight.[5] By all accounts, the officers did not arrive to arrest the defendant until after 7:05 p.m., so the most likely explanation for the writing of a seven on the form, if that occurred, is a mistake. Furthermore, Mrs. Ramos testified that she wrote the zero and the five. *See* Tr. at 145:4. Thus, even if Mrs. Ramos signed the Consent Form at 9:05 p.m., and correctly wrote that time when she signed it, as the defense seems to contend, her signing of the Consent Form would still precede a 9:20 p.m. recovery of the rifle. *See* GX10. In other words, it is not clear that the police had anything to gain by changing "9:05" to "8:05," since both

---

[5]  *See* GX1.

times precede the discovery of the evidence at "2120 hours."  GX1; GX10.

The Court further observes that, setting aside the conflicts between Mrs. Ramos' testimony and the other evidence in the record, Mrs. Ramos' account is not entirely credible standing on its own.  In particular, the Court does not find credible Mrs. Ramos' testimony that the police, having immediately found firearms evidence upon searching her apartment, left with that evidence, but then brought the firearms back into her apartment.  *See* Tr. at 143:1–5.  Mrs. Ramos' mention of a "forensic" does not make this story more plausible.  Tr. at 143:12.  For all of these reasons, the Court rejects, as not credible, Mrs. Ramos' testimony that police found the challenged rifle and ammunition during the second visit to her apartment, and she did not sign the Consent Form until the third police visit.  *See United States v. Sylla*, No. 08-cr-906(KAM), 2010 WL 582575, at *8 (E.D.N.Y. Feb. 16, 2010).

The Court further concludes that Mrs. Ramos voluntarily consented to the search of the closet that produced the rifle and one round of ammunition at issue notwithstanding testimony that the police fruitlessly searched the defendant's bedroom before Mrs. Ramos signed the Consent Form.  *See United States v. Wilson*, 914 F. Supp. 2d 550, 563 (S.D.N.Y. 2012); *United States v. Agapito*, 477 F. Supp. 706, 714 (S.D.N.Y. 1979).  In particular, Mrs. Ramos testified that the police initially asked to search the defendant's bedroom, and Mrs. Ramos "said no," but the officers, nevertheless, "started looking around."  Tr. at 121:14–16.  Similarly, Mercado testified that the police searched the defendant's bedroom before Mrs. Ramos signed the Consent Form, although she was not present at the relevant time.  *See* 155:18.

For all of the reasons set forth above, the Court finds grave credibility problems with Mrs. Ramos' testimony at the hearing.  However, if the Court were to credit Mrs. Ramos' testimony that she had initially "refused" to consent to a search, that would merely be one, nondispositive

factor against finding that her later (written and verbal) expressions of consent were voluntary. *Echevarria*, 692 F. Supp. 2d at 336–337; *see Crespo*, 834 F.2d at 270.

In light of the totality of the circumstances here, the Court finds that the officers' fruitlessly "looking around" before Mrs. Ramos provided both written and verbal consent to search did "not constitute [an] act[] of coercion sufficient to have overwhelmed" Mrs. Ramos' "ability to act voluntarily." *Wilson*, 914 F. Supp. 2d at 563. In particular, as explained above, the Court finds that Mrs. Ramos signed the Consent Form before the officers searched for and discovered the rifle and ammunition. The Consent Form expressly advised Mrs. Ramos of her right to "refuse" or "revoke [her] consent, in whole or in part, at anytime[sic]." GX1. Mrs. Ramos chose, nonetheless, to sign the Consent Form. According to Mercado, who testified that she was present at the relevant time, Mrs. Ramos also, subsequently, gave her verbal consent for the search of the closet that produced the rifle and ammunition. *See* Tr. at 121:10–14, 156:9–10 ("They asked if they could just look inside of [the closet]. And again, she said go ahead because, again, it's her closet.") When asked if she ever gave verbal consent for the search, Mrs. Ramos testified only that she did not remember. *See* Tr. at 128:3. In light of the great weight of evidence that the police did not use coercive tactics to obtain Mrs. Ramos' consent, including the absence of physical force or deception, the Court finds that Mrs. Ramos voluntarily consented, in writing and verbally, to the search of the closet that produced the rifle and one round of ammunition.

Finally, the defense attempted to impeach the testimony that Mercado had called Prilook and told him about the rifle, prompting the search that produced the evidence in issue. Although not a proper business record, the defense offered, without any objection from the government, an image purporting to show Mercado's phone records the night of the search. *See* DXE, DXH. Mercado then testified that those records did not reflect any outgoing calls to Prilook's phone

number. *See* Tr. at 159–162. In light of this evidence, a factfinder reasonably could doubt that Mercado had called Prilook about the rifle, as the defense urges. This evidence is not dispositive of the issue, however. Indeed, a factfinder reasonably could, instead, credit the testimony of Prilook and Garay that Mercado did call Prilook, and infer that Mercado used a landline, Mrs. Ramos' phone, or another phone to place the call.

Mercado herself, like Prilook and Garay, testified that officers came back to the apartment a third time to conduct a second search, having already searched the defendant's bedroom without result. *See* Tr. at 155:16–17. It is not clear what the defense contends prompted the second search. Given the availability of innocent explanations, the Court is not prepared to conclude that Prilook lied about receiving a call about the rifle, let alone to infer a broader conspiracy on the part of the NYPD to falsify the circumstance of Mrs. Ramos' consent to search. In any event, the reason for the second search is not critical to the motion to suppress.

As explained above, the great weight of the testimony is that Mrs. Ramos voluntarily consented to a search of her apartment before Prilook and Garay discovered the rifle and one round ammunition. The Court likewise credits Prilook's contemporaneous notes from the night of the search, which reflect that Mrs. Ramos gave her consent to search the apartment before the officers recovered the firearms evidence. *See* GX10. Accordingly, the Court concludes that the government carried its burden to show, by a preponderance of the evidence, that, in light of the totality of the circumstances, Mrs. Ramos gave her voluntary consent for the search that produced the rifle and single round of ammunition at issue. *See Isiofia*, 370 F.3d at 232.

## IV.    <u>CONCLUSION</u>

For the reasons set for the above, Ramos' motion to suppress is DENIED.  The Clerk of

Court respectfully is requested to terminate the motion pending at docket entry 33.

**SO ORDERED.**

**Date:  January 31, 2025**
      **New York, NY**

**MARY KAY VYSKOCIL**
**United States District Judge**

26